STANLEY A. FRICK et al., Appellees, v. ROCKWELL CITY CANNING COMPANY et al., Appellants.

**CORPORATIONS: Fiduciary Relation of Officers—Failure to Reveal**
1 **Facts.** A surrender to a corporation, for a valuable consideration, of corporate stock may not be repudiated on the ground that, *after* the surrender had been informally agreed on, but *before* the surrender had been formally executed, the officers of the corporation negotiated for an advantageous sale of the property, and did not reveal such fact to the surrendering stockholder.

**PRINCIPAL AND AGENT: Ratification of Unauthorized Contract.**
2 Principle affirmed that the ratification of an unauthorized contract relates back to the time when the contract was made.

**FRAUDS, STATUTE OF: Executed Contracts.** The statute of frauds
3 becomes quite immaterial, in a controversy over an executed contract.

**ESTOPPEL: Change of Position.** One may not repudiate his own acts
4 and conduct which have caused another to radically change his financial condition.

*Appeal from Calhoun District Court.*—E. G. ALBERT, Judge.

FEBRUARY 15, 1921.

REHEARING DENIED OCTOBER 1, 1921.

SUIT in equity, to set aside the transfer of corporate stock made by plaintiffs to defendant corporation, and to restore said shares of stock to the plaintiffs, on the ground of constructive fraud, inducing surrender of the stock. Relief was granted, as prayed, and defendants appeal. Facts appear in opinion.—*Reversed.*

*John W. Jacobs* and *E. C. Stevenson,* for appellants.

*Gray & Gray, S. A. Frick,* and *L. H. Salinger,* for appellees.

ARTHUR, J.—The original petition charged actual fraud, alleging that defendants misrepresented the value of the stock, thereby inducing the plaintiffs to surrender 32 shares of stock for cancellation.

1. CORPORATIONS: fiduciary relation of officers: failure to reveal facts.

Plaintiffs' pleadings, on which the trial was had, allege facts which, they claim, constitute constructive fraud, practiced on plaintiffs to induce them to surrender their stock. Defendants insist that plaintiffs' pleadings stated no cause of action. Plaintiffs' amended and substituted petition, on which they went to trial, was not demurred to by defendants, nor did defendants attack it by motion. But defendants did raise the point that the pleadings stated no cause of action, by objecting to the introduction of all testimony offered by the plaintiffs, and by motion made at the conclusion of defendants' testimony to dismiss plaintiffs' petition, and also by such motion renewed at the conclusion of all the testimony. We think we may treat plaintiffs' pleadings,—the amended and substituted petition and reply,—without entering upon a critical analysis, as sufficiently alleging a cause of action based on constructive fraud, and proceed to the merits of the case.

Plaintiffs charge that defendants were guilty of constructive fraud in concealing from them, at the time they finally transferred their 32 shares of stock to the defendant corporation, the fact that certain correspondence had been had, at the in-

stance of one Bell, and what the correspondence was, between F. E. Burnham, secretary and manager of the defendant corporation, and the Waterloo Canning Company, being a proposition by Burnham to sell the plant.

Defendants deny that they were guilty of any fraud whatever, either actual or constructive. Defendants allege that, in compliance with negotiations and arrangements made in the spring and summer of 1917, plaintiffs, on or about September 10, 1917, entered into an oral agreement with F. E. Burnham, secretary and manager, whereby the plaintiffs would surrender and turn over to the company the 32 shares of stock held by them, and the stockholders would execute an agreement releasing the plaintiffs and the estate of M. W. Frick, deceased, from all liability on the part of the company, and Stanley Frick would draw up such an agreement for the stockholders to sign; that such agreement was drawn up by Stanley Frick and turned over to Burnham, and was thereafter signed by the stockholders, except two of them; and that signing by these two stockholders was waived by plaintiffs, and the 32 shares of stock turned over to the company, and the stock canceled.

Plaintiffs claim that the agreement of September 10, 1917, was not a completed contract; that Burnham had no authority to make it; that the evidence of such a contract, under the statute of frauds, would have to be in writing, and therefore is not proven; that there was no completed contract until about January 2, 1918, when the written agreement was executed for turning over the stock, and the stock was turned over: and the plaintiffs contend that such contract is void and not effective; and that they are not estopped thereby, because of the concealment from them and their consequent ignorance of the correspondence with the Waterloo Canning Company.

Defendants say that the agreement entered into between the plaintiffs and Burnham, secretary and manager, on September 10, 1917, was a completed contract; that, although Burnham, secretary and manager, had not, at the time he made the agreement, been authorized by the defendant company to make it, his acts in so making it were approved and ratified by the defendant company; that the defendant company had authority to do this; and that such ratification relates back to the time the

agreement was made, and constituted a binding contract, as of the date of September 10, 1917; that defendants, after September 10, 1917, were under no obligations, by reason of fiduciary relations or otherwise, to reveal to the plaintiffs the Waterloo negotiations; and that plaintiffs are estopped by their act.

Estoppel is also claimed because of the acts of plaintiffs in the spring and summer of 1917, in procuring their mother's interest in the 32 shares of stock and communicating to defendants their desire to transfer the stock to the company, and to have it canceled, and to be absolved from any liability on the part of the company, and in refraining from helping to finance the company in the operation of its plant for the pack of 1917, and in inducing the other stockholders not to make a claim against the estate of M. W. Frick for the proportionate obligations of the company of said estate, and not asking or requiring the plaintiffs to furnish their share of the expense of operating the plant.

In the year 1902, the defendant corporation was organized. 252 shares of stock of the par value of $100 were issued, producing a capital of $25,200. The corporation then constructed a plant, which cost in the neighborhood of $42,000, incurring a debt of about $17,000; and there was no money with which to carry on the business.

The business proved very hazardous and uncertain; and, in order to get credit to run the plant, the company was compelled to borrow from $50,000 to $85,000 a year from the banks. The banks would not extend credit without the indorsement of the individual stockholders; and, in pursuance of this condition, in 1905, a written stipulation was entered into, signed by all the stockholders, which provided, in substance, that whatever money was borrowed or indebtedness created by the corporation, each would stand his proportionate share, regardless of whether they, as individuals, signed the obligation or not.

There were two years during the existence of this corporation that the company did no canning business; and the books show that, up to the year 1918, no dividends had been declared, and many years show a deficit, while some other years show a paper profit; but whatever profits there may have been, went back into the property, by way of improvements; and the actual

condition of the company in the spring of 1917 showed that it was the owner of the canning plant, with a small amount of funds on hand, and with an outstanding indebtedness of over $20,000.

M. W. Frick was one of the original incorporators of the company, and owned 32 shares of stock. He was also one of the signers of the written contract made in 1905, hereinbefore referred to, and was an indorser on the $20,000 note representing the outstanding indebtedness in the spring of 1917. He died on the 16th day of January of that year, still being the owner of said stock. He left surviving him a widow and two sons, who then became the owners of said stock. The two sons, who are the plaintiffs in this action, purchased the widow's share in the stock, on or about the 24th day of July, 1917; and thus these two plaintiffs became the sole owners of said stock. After the death of the father, these two boys learned of the outstanding note of $20,000, on which their father's name appeared as indorser, and also of the aforesaid contract of 1905, to which he was a party; and whether or not, as a law proposition, on coming into the ownership of said stock they were bound to step into their father's shoes and carry out his part of the 1905 contract, they nevertheless believed that the duty devolved upon them, and that, if they retained said stock, it would be their duty to indorse the paper which it was necessary to issue to the banks, to procure the money to make the pack for the coming season of 1917; and whatever they did thereafter in relation to this stock was done with this belief on their part.

Some time in May, 1917, the plaintiffs learned from one of the members of the company that, if they expected to hold their stock, they would be expected to share the responsibilities and liabilities, the same as their father had done before them. Neither of the plaintiffs had any disposition to do this, and negotiations were commenced between one of the plaintiffs and some one or more of the officers of said company, looking to the plaintiffs' turning in their stock and being released from future liabilities of the corporation, and also releasing the Frick estate from liability on the $20,000 note. In the latter part of August or the first of September, Harold Frick, who was then a resident of Kansas City, wrote his brother, Stanley Frick, who was then

residing in Rockwell City, a letter, the material part of which is as follows:

"You may make the same disposition of my interest in the Canning Factory stock as you propose to make of yours, viz.: turn it over to the present stockholders with a written contract that I shall be relieved from all past and future personal liability."

Pursuant to this letter from Harold, and on or about the 10th of September, 1917, Stanley Frick advised the manager, Burnham, that he and his brother had decided to turn in their stock to the corporation for cancellation, provided that all the other stockholders would sign a contract releasing the plaintiffs from any future liabilities on the part of said corporation, and also from any liability on the $20,000 note. The manager advised Stanley Frick to prepare such a written guaranty as he desired, and to turn the same over to the manager, who would have the stockholders sign it. Later,—the exact time being in dispute, but at least not later than the first week in December, 1917,—Stanley Frick prepared the written contract of guaranty, and turned the same over to the manager, to procure the signatures of the other stockholders. They signed the same at various times, the last one signing on the 31st of December, 1917. Two of the stockholders never did sign this contract; and, on the 2d of January, 1918, Stanley Frick accepted this written contract, waiving the two signatures that were not attached thereto, and turned over the 32 shares of stock to Manager Burnham.

During the life of said corporation, various attempts were made to dispose of the property, at prices varying from $10,000 to $30,000; but at no time and at no price were they able to dispose of the plant. The extreme hazards of the business and the annual necessity of borrowing such large amounts of money and making the stockholders individually liable therefor proved very burdensome to the stockholders, and naturally they were anxious to be relieved from such burdens, as is shown by their testimony and by their offers to sell the property at less than 25 per cent of what it had cost them.

We are quite satisfied that, at the time of the death of the elder Frick, and even later, all persons who had anything to do with this canning company considered the stock entirely worth-

less, and would have been more than glad to have disposed of the property at such a figure as that the proceeds thereof would liquidate the indebtedness of the company, each stockholder thereby losing what he had invested in his stock.

At the time that the plaintiffs became interested in this stock by the death of their father, and learned of the outstanding liabilities, both past and future, they interviewed Burnham, the secretary and manager, as to the condition of the company. At that interview, the books of the company were furnished the plaintiffs for inspection, and it seems to the court that the manager fairly stated to the plaintiffs the apparent condition of the company. There is some dispute in the testimony as to just what took place at this interview, but all agree that, at that time, the manager and a number of the officers were anxious to have the plaintiffs continue as stockholders of the company; and, as long as all the parties agreed to this, it is fair to say that the manager would not intentionally misrepresent the condition of the company. The books of the corporation were there before the plaintiffs, and, among other things, showed the trial balances for all the years during which the corporation had existed. These trial balances are not difficult to understand, and the plaintiffs had the right and were afforded the opportunity to inspect them. Stanley Frick was a lawyer, and understood such matters.

About the middle of December, 1917, one Bell, who was interested in a similar canning company at Waterloo, appeared at the plant in Rockwell City, and, after looking it over, asked the manager to put a price on it. He priced it at $30,000. Bell requested him to put it in writing, and forward such written offer to himself or his company at Waterloo. This was done.

Bell testifies that he could not have bought this plant himself, and that he could not have bought it for his corporation at Waterloo, without the assent of that corporation; and that, while he personally deemed the price reasonable, he could not say what his corporation would have done in relation thereto. Nothing came of the offer made by Burnham, manager, at Bell's request, to the Waterloo company.

Shortly after the middle of January, 1918, the Stuarts, of

Grimes, Iowa, looked over the plant, and, on the 23d day of January, 1918, bought the plant for $30,000.

The $20,000 note on which M. W. Frick was an indorser was never filed as a claim against his estate; and Stanley Frick testified that, some time in the midsummer of 1917, he had advised the manager that they intended to turn in said stock, and have the same canceled. After this time, the other stockholders of the company signed the necessary notes, aggregating $14,000, at the banks, to raise funds to finance the pack for the fall of 1917; and the plaintiffs were not asked to indorse any of said paper.

At the time plaintiffs turned over their stock for cancellation, on the 2d day of January, 1918, they knew nothing of the proposition made by Burnham, at the request of Bell, for the sale of this property to the Waterloo Canning Company.

On the completion of the sale of said plant to the Stuarts, and the disposition of the other assets of the corporation, the company proceeded, after liquidating their indebtedness, to divide the remainder among the then owners of the stock. The Frick 32 shares having been canceled, this action was brought by the plaintiffs, aided by an injunction, to recover the value of their 32 shares.

It is apparent that no actual fraud was committed on the plaintiffs in this transaction; and, in fact, no such claim is made in the pleadings of the plaintiffs. Plaintiffs' alleged right of recovery is based on the theory that a fiduciary relation existed between the officers of this company and its stockholders, relative to any dealings between them as to the stock owned by such stockholders; and that, when there was an attempt made to deal for the stock, there was a duty on the part of such officer, director, or manager to fairly and frankly communicate to the stockholders all of the knowledge possessed by such officer or manager relative to said corporation or its assets, which would in any way affect the value of such stock in the mind and opinion of the then holder of the stock; and that, if such facts were known to such officer or manager, and were not communicated to the then owner of the stock who was about to dispose of it, then the officer or manager breached his duty to the stockholder, and the transaction would be void.

The only serious contention that can be made in this case under this theory of the plaintiffs' is that the manager, Burnham, failed to communicate the negotiations had between him and Bell and the Waterloo Canning Company in December, 1917; and that by such failure he breached the duty he owed the plaintiffs, provided that the information that he then had, relative to the Bell proposition, was of such a character or nature as that, had it been known by the plaintiffs, it would have enhanced the value of their stock, in their judgment.

The court gives no consideration to the sale of the property to the Stuarts, because the negotiations therefor and the sale itself took place after the plaintiffs had turned in their stock.

For a proper determination of this question, it must be found when the contract was made for the turning in of this stock and the giving of the written guaranty. The defendants contend that it was a completed contract on the 10th of September, 1917. The plaintiffs contend that it was a completed contract on the day when the stock was turned over, to wit, January 2, 1918. Defendants therefore say that the negotiations with Bell, not having occurred until after September 10th, have no bearing on this issue. On the other hand, the plaintiffs, under their claim, say that they did have a bearing on this issue, and that plaintiffs would not have turned over their stock, had they known of these negotiations; and they so testify.

When Stanley Frick received the letter from his brother, he advised Burnham, secretary and manager, that they had decided to turn in their stock, if the other stockholders would give them the written guaranty against liability; and the manager replied that Stanley Frick should prepare the written guaranty he desired, and he, the manager, would procure the signatures of the other stockholders thereto.

The trial court was of the opinion that the agreement between plaintiffs and Burnham, secretary and manager, of September 10, 1917, was not a contract binding on the plaintiffs, because there was no showing in the evidence that Burnham was authorized by all of the stockholders in the company to make any such agreement with the plaintiffs, so as to bind the other stockholders individually; and that, as the last stock-

holder signed said writing on the 31st of December, and it still lacked the signature of two of the stockholders, it was not a completed contract until January 2, 1918, when it was turned over to the Fricks; and that Burnham, secretary and manager, breached his duty to these plaintiffs in failing to convey to them the information he then possessed relative to the Bell negotiation, which occurred on December 21, 1917.

We think the learned trial court erred in so holding. Truly, it does not appear in the evidence that Burnham, secretary and manager, had been authorized by the defendant company or its stockholders to make the agreement which he did make with the plaintiffs on September 10, 1917. But conceding that Burnham, secretary and manager, had not, at the time he made the agreement with plaintiffs through Stanley Frick, on September 10, 1917, been authorized by the defendant company or the stockholders to make it, his acts in so making the agreement were approved and ratified by the defendant company, and such ratification relates back to the time the agreement was made, and constitutes a binding contract, for the purposes of estoppel, as of the date of September 10, 1917. *Long v. Osborn,* 91 Iowa 160; *Eadie, Guilford & Co. v. Ashbaugh,* 44 Iowa 519; Story on Agency, (9th Ed.), Sections 244, 250.

2. PRINCIPAL AND AGENT: ratification of unauthorized contract.

Plaintiffs cannot now be heard to complain because two stockholders did not sign the writing for the transfer of the stock and the exoneration of plaintiffs from liability, for plaintiffs waived the signing of the two stockholders, and accepted the contract without their signatures.

Appellees contend that, since the guaranty stipulated for on September 10, 1917, was not evidenced in writing, it is void, and does not bind the plaintiffs; and that nothing passed to plaintiffs until such guaranty was reduced to writing. Undoubtedly, if the oral agreement of September 10th had not been reduced to writing, and it was attempted to enforce it, the statute of frauds would be a complete defense to such action. But that is not the question here. This contract was executed and is not vulnerable to this attack. *Coffin v. Bradbury,* 3 Ida. 770 (95 Am. St. 37).

3. FRAUDS, STATUTE OF: executed contracts.

The agreement of September 10, 1917, fixed a status which was relied upon and acted upon by both plaintiffs and defendants. After the agreement on September 10th, there was no occasion for Burnham, or any other officer of the company who knew of it, to speak to plaintiffs about the proposition that Burnham, at the instance of Bell, made to the Waterloo Canning Company. Why should it occur to them to speak to plaintiffs about that transaction, which could in no way concern plaintiffs, they having agreed to transfer their stock to the company for the consideration of being exonerated from any liability on the part of the company? Why should Burnham, or any other officer of the company, tell the plaintiffs about any transaction or move on the part of the company, when all parties were proceeding and carrying out with integrity the agreement of September 10th, whereby plaintiffs were no longer stockholders?

We conclude that Burnham, secretary and manager, did not breach his duty to the plaintiffs in failing to convey to them the information he possessed relative to the Bell negotiation; that, by the oral agreement of September 10, 1917, which was afterwards reduced to writing and ratified and executed (the defendants thereby assuming an additional liability which had theretofore existed against the Frick estate), estoppel was made out. That is to say, when, believing and acting and relying on the statements and conduct and agreement on the part of the plaintiffs, defendants changed their position to their detriment, by assuming this liability for which the Frick estate was primarily liable, this constitutes estoppel, and is available to defendants.

4. ESTOPPEL: change of position.

Plaintiffs cannot avail themselves of the doctrine that "no estoppel arises where the representation or conduct of the parties sought to be estopped is due to ignorance, founded upon an innocent mistake;" for the ignorance—the want of knowledge of the correspondence with the Waterloo Canning Company about the sale of the property—was not as to a matter of which they had a right to be apprised.

Also, we think that the conduct and acts of plaintiffs, outside of the express agreement of September 10, 1917, constitute estoppel against their recovery.

The decree and judgment of the court below are reversed,

and cause is remanded for any further order or judgment necessary.—*Reversed and remanded.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.